**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LORI BETH ZOLNO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 9511** |
| | ) | |
| **v.** | ) | **Magistrate Judge Cole** |
| | ) | |
| **CAROLYN W. COLVIN,[1] Commissioner** | ) | |
| **of Social Security** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Lori Beth Zolno seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), §§ 42 U.S.C. 416(I), 423. Ms. Zolno asks the court to reverse the Commissioner's decision, or in the alternative remand for a supplemental hearing. The Commissioner asks that the decision be affirmed.

## I.

## PROCEDURAL HISTORY

Ms. Zolno applied for DIB on March 26, 2010, alleging that she became disabled in August 2008, due to multiple sclerosis ("MS"), headaches, and allergies. (R. 132-38, 166, 171).[2] Her claim was denied initially and upon reconsideration. (R. 96-96, 105-08). Ms. Zolno subsequently requested an administrative hearing. An administrative law

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue for appellee.

[2] Ms. Zolno gave two different dates as her onset of disability: August 2, 2008 (R. 166), and August 31, 2008. (R. 171).

judge ("ALJ") presided over the hearing on July 27, 2011, at which Ms. Zolno, represented by counsel, appeared and testified. Dr. Jeffrey Lucas also testified by telephone as a vocational expert. (R. 56-95). On August 24, 2011, the ALJ issued a decision denying Ms. Zolno's application for DIB, finding that she was not disabled because her MS and allergies were not so severe as to render her unable to do past relevant work as an office and retail clerk or counselor. (R. 8–22). This became the final decision of the Commissioner when the Appeals Council denied Ms. Zolno's request for a review on October 2, 2012. (R. 1-5). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Zolno has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

### THE EVIDENCE OF RECORD

#### A.

#### THE VOCATIONAL EVIDENCE

Ms. Zolno was born on April 29, 1975, which made her thirty-six at the time of the ALJ's decision. (R. 132). She is unmarried, with no children, and currently resides with her mother and stepfather. (R. 410). Her highest level of education is a Bachelor of Arts in Sociology. (R. 60). At the time of the administrative hearing, Ms. Zolno weighed approximately 125 pounds at a height of 5'3". (R. 80). She has prior employment working as a data clerk for the Gateway Foundation and as a counselor for a half-way house and facility for disabled children. (R. 172). More recently, Ms. Zolno worked for Walgreens as a data clerk. (R. 63, 172). She lost that job when she was

arrested and incarcerated for attempted criminal sexual assault with a minor who had been a client at Gateway. (R. 130, 410, 171).

## B.

### THE MEDICAL EVIDENCE

Ms. Zolno was first diagnosed with MS in 1998 when she was 23 years old. (R. 410). Her symptoms began with the development of some blurred vision. (R. 398). She began seeing an ophthalmologist, who felt her examination was abnormal. He sent her to a neurologist, who performed an MRI, which revealed a possible demyelinative disorder. (R. 398). Ms. Zolno's doctors declined to initially diagnosis her with MS out of caution, and prescribed Prednisone which temporarily remedied her symptoms. (R. 398). In 2001, however, Ms. Zolno began to have numbness in her legs and was sent for another MRI on February 6, 2001. (R. 398). The results of the second MRI were consistent with a demyelinative disorder that had progressed since the 1998 MRI. (R. 398). She was then officially diagnosed with MS. (R. 399). At the time, she reported allergies to cat dander and hayfever, and had chronic headaches. (R. 399). At the time of her diagnosis, examination revealed her mental state, motor functions, reflexes, sensation, coordination, and gait were all normal. (R. 400).

The record is silent on Ms. Zolno's condition between 2001 and 2004. By 2004, she was seeing Dr. Trelka and participating in physical therapy, which was helping her condition, although her gait was reported as "slow" and her tandem gait as "fair." (R. 394). Her upper extremities appeared normal. (R. 394). She reported she was doing very well in February 2005. Her gait and coordination were slightly slowed. (R. 393).

In September 2005, her gait remained intact, and her condition was well controlled with medication – Avonex and Baclofen. (R. 392).

An MRI was done on December 12, 2005, after Ms. Zolno complained of fatigue and slurred speech. (R. 388). The MRI revealed lesions and edema consistent with MS. (R. 388–89). By December 27th, following a steroid dose, Ms. Zolno was essentially back to normal. (R. 388). In the following years, reports by Dr. Trelka revealed further incidents of fatigue, slurred speech, and difficulty sleeping. (R. 377–87). Gait and coordination generally remained intact. (R. 378, 380, 383-84, 386). Her main difficulty appeared to be recurrent problems with speech. (R. 377-87).

Ms. Zolno had an MRI of her back on March 29, 2008. It revealed a slight disc dessication at L4-L5, plus a L4-L5 degenerative disc bulge. (R. 421). The rest of the lumbar discs were reported as functionally normally. (R. 421).

Dr. Allen prepared a medical report dated July 16, 2008 regarding Ms. Zolno in anticipation of her incarceration. (R. 418). Dr. Allen had been treating Ms. Zolno for approximately a year at the time. (R. 418). The letter described her back pain, the results of her MRI scans, weakness in her lower extremities, weakness on right foot eversion, intermittent slurring of speech, and some fatigue as a result of MS. (R. 418). The doctor set forth specific limitations for Ms. Zolno's prison work details and sleeping arrangements while incarcerated: a period of rest no less than 10 minutes per hour, a lower bunk, the avoidance of prolonged standing for more than 20-30 minutes, avoidance of heat greater than 85 degrees Fahrenheit, a carrying restriction of 10 pounds, total climbing restriction, and that she be permitted only light work detail, specifically restricted from laundry duties. (R. 418).

4

On June 4, 2010, Ms. Zolno had a consultative exam with Dr. Weiss for the Bureau of Disability Determination Services.  (R. 429).  Dr. Weiss's report discussed Ms. Zolno's complaints of daily headaches, which she has had since she was 18 years old and which worsen on snowy and rainy days.  (R. 439).  The doctor reported normal spinal movement and a broad-based gait, and observed Ms. Zolno had no difficulty getting on and off the exam table, sitting, standing, or squatting to 40 degree knee flexion.  (R. 431–32).  Ms. Zolno had only mild difficulty in heel-walking and toe-walking, had an unsteady tandem gait, and was unable to do a single leg balance.  (R. 432).  Grip strength and dexterity were normal.  (R. 432).  Her muscle strength was generally 5/5 everywhere except her hip flexors (3/5) and knee flexors (4/5) bilaterally.  (R. 432).  Reflexes were normal.  (R. 432).  Dr. Weiss reported claimant's mental status seemed normal: she was alert, remembered her medical history, and seemed capable of handling funds in her own interest.  (R. 432).

Dr. Calixto Aquino reviewed Ms. Zolno's medical record on behalf of the disability agency on June 29, 2010.  The doctor stated Ms. Zolno could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk or sit with normal breaks for approximately 6-hours in a normal 8-hour work day, and had unlimited mobility for pushing and pulling (within the pound restrictions).  (R. 437).  The doctor felt that she could occasionally climb ramps and stairs, and occasionally perform balancing, stooping, kneeling, crouching, and crawling.  (R. 438).  She could not climb ropes, ladders, or scaffolds.  (R. 438).  She had no manipulative limitations, such as reaching, feeling, handling, and fingering, visual limitations, or communicative limitations.  (R. 439–40).  Her environmental limitations included avoiding concentrated exposure to extreme cold,

extreme heat, wetness, humidity and fumes, but she had no noise or hazards limitations. (R. 440). He noted that she had weakness in both her legs, but only slight gait abnormalities. (R. 437).

On March 25, 2008, Ms. Zolno had a spastic gait, fatigue, and some left leg weakness, but no numbness. (R. 425). She had right foot drop. (R. 425). She got daily headaches. On May 28, 2008, there was weakness in her right foot on eversion, but she had no other weakness, and no numbness or tingling; she reported that her leg got stiff. Her speech was less slurred. (R. 420). On July 16. 2008, exam revealed right foot weakness on eversion. (R. 417). It was noted that she should avoid prolonged standing, climbing, heat, and could carry less than 10 pounds. (R. 417). On August 25, 2008, it was noted that Ms. Zolno had fatigue, spasticity, and that she had difficulty balancing and walking. (R. 326). An unsteady gait was noted on November 21, 2008. (R. 330).

On April 28, 2010, Ms. Zolno reported fatigue, blurred vision in her left eye, but no weakness or numbness. Her gait was noted to be spastic. (R. 416). Ms. Zolno had a brain MRI on July 17, 2010. (R. 444). The MRI revealed that the presence of white-matter, and atrophy was greater than expected for someone of Ms. Zolno's age. (R. 444–47).

Ms. Zolno began receiving free medical treatment from the Ark in March of 2010. (R. 61, 411).. She began psychiatric treatments there in April of 2010 for her anxiety and depression. (R. 412). As the psychiatric treatments continued, most of the medical reviews described her mood as "stable" with no excessive anxiety. (R. 407–10, 459, 461). She was prescribed Xanax and Prozac after these visits. (R. 459, 461). Ms.

Zolno also got refills from Ark for medications for her MS, allergies, and lower back pain. (R. 408, 460).

## C.

## THE ADMINISTRATIVE HEARING TESTIMONY

## 1.

## MS. ZOLNO'S TESTIMONY

Ms. Zolno testified that she was 36 and had a B.A. in Sociology, which is her highest level of education. (R. 60). She lived in a first-floor condominium. (R. 83).

Ms. Zolno testified that the last job she worked was at Walgreens as a data clerk, working on a computer performing tasks such as data entry. (R. 62–63). Ms. Zolno explained that the job also required frequent communication with coworkers, either via email or in person. (R. 65). It required no lifting or carrying, though sometimes she would have to get up and pick up a print-out from the printer. (R. 63–64). Contrary to what she had said when applying for benefits, Ms. Zolno testified that she left the job because she struggled sitting for long periods of time. (R. 64, 65). She claimed that, since 2007, she was able to sit for only 10 minutes at a time. (R. 65). Her time management and ability to work consistently was affected by her need to occasionally get up and walk around. (R. 64–65). While incarcerated after the alleged onset date, Ms. Zolno had a quarter detail where she would clean windows and mirrors for five days a week, twice a day, for ten minutes each time. (R. 89–90).

When questioned about looking for work, Ms. Zolno admitted to looking over the past year, but said that she had difficulty finding a position that would allow her to sit

down and walk around intermittently. (R. 65–66). She testified to only browsing the paper, but not actually submitting applications. (R. 66).

Ms. Zolno then testified about her home life abilities. (R. 67). She described a good day, where she is able to leave the house, go shopping and do some laundry. (R. 67). She enjoys watching baseball and reading. (R. 68). She is able to take care of personal needs, though with caution: she can wash her own hair slowly, using one hand to wash and the other to hold onto the wall to prevent her from falling. (R. 69). She can dress herself, though she has to be sitting down or holding something to steady herself. (R. 72). She stated she still drives about two days a week, typically to therapy or to the Ark. (R. 61).

She struggles with bending and stooping, and has to move slowly when getting in and out of the car. (R. 82–83). Comparatively, on a bad day Ms. Zolno testified that she will wake up and feel dizzy and unsteady immediately in the morning. (R. 71). She walks back and forth across her house, trying to help the stiffness in her legs. (R. 71). She testified to being unable to sleep well on these days, which subsequently makes her feel fatigued and further slurs her speech. (R. 71). She has a cane, but only uses it when necessary. (R. 71). She claims to have about three or four bad days a week. (R. 74).

When questioned about her mental health, Ms. Zolno described instances of anxiety, which induces racing thoughts that make it difficult of her to fall asleep. (R. 72). However, she is prescribed Xanax which helps her fall asleep. (R. 75). She reported some issues with concentration, where she may lose her train of thought easily, especially when sleep deprived. (R. 81–82). She testified that she would struggle in any job that always needs her to be understood when communicating. (R. 72–73).

In general, Ms. Zolno testified to shakiness and unsteadiness in her lower extremities, which is worse in her right leg than her left. (R. 76). She testified to shaking in mostly her right leg, and reported incidents of falling. (R. 77–78). For example, Ms. Zolno reported falling the morning of the ALJ hearing when her right leg gave out. (R. 77). She claimed to be unable to walk in a straight line, and had difficulty walking heel to toe without holding onto something. (R. 77). Ms. Zolno claimed to have a hard time using stairs, partially because it hurts her legs and partially because she fears falling. (R. 73). Her fatigue is induced by lack of sleep, walking around too much during the day, and being out in the heat. (R. 74).

Ms. Zolno testified to being unable to walk more than about half a block until feeling pain and needing to hold onto something. (R. 70, 74). In testifying about her pain, she stated that for the past four or five years, she begins to feel pain while sitting after about 10 minutes. (R. 65). The pain affects her legs, thighs, calves and back. (R. 65). She spends a few hours of the day laying down because it is typically easier on her legs, though she still needs to get up and walk around occasionally after laying down. (R. 84). She testified to some lower back pain, though has no sought treatment for it. (R. 79).

She is generally aggravated by hot temperatures, but is fine in cold temperatures. (R. 74). In heat, Ms. Zolno will feel dizzy, stiff, and nauseous. (R. 74). Ms. Zolno shared some problems with incontinence, where she needs to use the restroom every 30 to 60 minutes. (R. 80–81). Her medications for MS cause some side effects: the Rebif sometimes induces flu-like symptoms, including dizziness and nausea, which is worsened when Ms. Zolno is fatigued. (R. 75). Her prescription for Baclofen makes her

drowsy as well.  (R. 75).  She takes both of these prescriptions three times per week.  (R. 76).

## 2.

## THE VOCATIONAL EXPERT'S TESTIMONY

Dr. Jeffrey Lucas testified as the vocational expert.  (R. 85).  He designated the Walgreens job as semi-skilled,  light work and the position as a counselor as a sedentary position.  (R. 85).  He confirmed that the Walgreens job would take approximately 30-60 days for one to become proficient in.  (R. 85–86).  Dr. Lucas classified the position as a clerical or customer service position, number 209.562-010.  (R. 86).

The ALJ asked Dr. Lucas if a person with Ms. Zolno's skill set, education of a bachelors' degree, and age would able to do Ms. Zolno's prior relevant work, despite health limitations like climbing, balancing, stooping, kneeling, crouching, crawling occasionally, no ladders, ropes or scaffolds, no extreme humidity or wetness, and fumes and odors.  (R. 86–87).  Dr. Lucas replied "I don't see any reason . . . why she couldn't go back to those." (R. 87).

The ALJ questioned Dr. Lucas on the report by the screening neurologist Dr. Allen prepared three years earlier that described her work restrictions as requiring a break every 10 min, no prolonged standing for longer than 20 or 30 min, no heat above 85 degrees, no lifting or carrying above 10 pounds, and no climbing.  Dr. Lucas noted the biggest issue in these restrictions: the 10 minute break.  According to Dr. Lucas, Ms. Zolno could be permitted a break after two hours for 15 minutes; then a lunch break after another two hours; then a 15 minute break after two hours.  (R. 88).  If that limitation is

necessary, as Dr. Lucas testified, Ms. Zolno would be prevented from working any job in the United States. (R. 88).

The ALJ presented Dr. Lucas with a hypothetical, in which Ms. Zolno was restricted by Dr. Allen's described limitations without including the 10 minute break. (R. 89). Dr. Lucas testified that under this hypothetical, Ms. Zolno could be placed in a cashier position, no. 211.482-010 or a data clerk position, no. 203.582-054. (R. 89).

In evaluating the weight of Ms. Zolno's communication difficulties, Dr. Lucas confirmed that the positions he evaluated her for would not require much hearing or talking. (R. 91). This is true even for a cashier position, which may have customer interaction but does not, according to the DOT standards, require hearing or talking. (R. 91). Dr. Lucas testified, however, that none of the possible positions would be available to a person required to lie down for any portion of the work day. (R. 92).

Dr. Lucas testified that these positions required a significant use of upper extremities, where handling, holding or fingering would consist of about one third to two thirds of the day. (R. 92). Finally, Dr. Lucas shared that if Ms. Zolno was given any restrictions around unprotected heights or heavy equipment, this would not change her functional capability to work at a cashier or data clerk level. (R. 93).

### III.

### THE ALJ'S DECISION

The ALJ began his analysis by addressing steps one and two of the five-step sequential analysis for a claimant seeking DIB under the Act. (R. 13). He found Ms. Zolno met the insurance requirements of the Act through December 21, 2013. (R. 13). Further, he determined that Ms. Zolno had not engaged in any substantial gainful activity

since her alleged onset of disability date of August 2, 2008. (R. 13). Therefore, the first two prongs of the analysis were satisfied.

At the third step of the analysis, the ALJ held that Ms. Zolno had severe impairments of MS and allergies. (R. 13). The impairments were considered severe because they "more than minimally affect[ed] the claimant's functional abilities in the workplace." (R. 13). The other asserted impairments, including headaches, back pain and knee pain, were held to be "non-severe" as they no more than minimally affect Ms. Zolno's ability to do basic work. (R. 13–14) . This was further supported by the evidence that these impairments were treated and "well-controlled" with medication. (R. 14). Further, the ALJ held that Ms. Zolno's mental impairments of major depressive disorder and anxiety were also non-severe. (R. 14). The ALJ reached this conclusion by evaluating the four broad functional areas in the disability regulations. (R. 14). The ALJ determined that Ms. Zolno had no more than a mild limitation or had no limitation from these mental impairments in her daily living, social functioning, concentration, persistence or pace, and decompensation. (R. 14–15).

After evaluating the level of severity of all of Ms. Zolno's impairments, the ALJ concluded that the combination of these impairments was not so severe as to equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1526). The ALJ reasoned that Ms. Zolno's MS did not meet or did not medically equal the definition of the disability by the disease from section 11.09. This is because, according to the ALJ, her medical evidence did not reveal substantial muscle weakness and fatigue resulting from a demonstrated neurological disease. (R. 16).

The ALJ examined Ms. Zolno's RFC and determined that she was capable of performing light work as defined in 20 C.F.R. § 404.1567(b). (R. 16). The ALJ clarified that Ms. Zolno's light work must not involve climbing ladders, ropes or scaffolds, temperature extremes, or dust fumes and noise. (R. 16). Her stooping, crouching, crawling, balancing, kneeling or climbing must be no more than occasional if at all. (R. 16).

The ALJ applied a two part test, evaluating: first, whether there is an underlying medically determinable illness that could reasonably be expected to create claimant's pain or other symptoms; and second, with part one established, the extent of the intensity, persistence and limiting efforts of the symptoms and evaluation to which they limit the claimant's function. (R. 17). The ALJ examined Ms. Zolno's medical evidence, including a comparison of the reports by Dr. Allen and Dr. Weiss, and determined that there is no "objective medical evidence" that establishes a basis for finding limitations greater than those set out in the judge's RFC determination. (R. 17–20).

Further, the ALJ felt that the objective medical evidence did not support Ms. Zolno's allegations of disabling pain and symptoms because her allegations were not entirely credible. (R. 20). The ALJ supported this credibility finding with the following evidence: that she successfully worked as a porter during her incarceration after the alleged onset date, that although the condition of her MS had gradually progressed and worsened, it appears generally stable, and that Ms. Zolno testified to looking for work. (R. 20).

Finally, the ALJ concluded that Ms. Zolno could also perform her past relevant work as a counselor. (R. 21). Her past work as a retail and office clerk was classified as

13

semi-skilled and light. (R. 21). Her counselor position, however, was classified as skilled and sedentary, requiring standing for no more than one hour per day and lifting no more than ten pounds. (R. 21). Therefore, the ALJ felt she would be able to perform her past relevant work for which she had prior training. (R. 21). Accordingly, he found her not disabled and not entitled to disability benefits.

## IV.

### DISCUSSION

#### A.

#### THE STANDARD OF REVIEW

We review the ALJ's decision directly, but we do so deferentially and we play an "extremely limited" role. *Weatherbee v. Astrue*, 649 F.3d 565, 568–69 (7th Cir. 2011); *Simila v. Astrue*, 573 F.3d 503, 513–14 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). We will not reweigh evidence or replace the ALJ's judgment with our own. *Weatherbee*, 649 F.3d at 568 (7th Cir. 2011). What we must determine is whether the ALJ's judgment is supported by substantial evidence, and if so, affirm the decision. *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993); 42 U.S.C. § 406(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir.2010). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila*, 573 F.3d at 513–514; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.2002). We must evaluate whether the ALJ provided "an accurate logical bridge" between the evidence to his conclusion that the claimant is not disabled. *Kastner v. Astrue*, 697 F.3d 642 (7th Cir. 2012). The evaluation is a "lax" standard. *Elder*, 529 F.3d at 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his or her decision to only that evidence that supports the ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ need only "minimally articulate" his justification for rejecting or accepting specific evidence of disability. *Berger,* 516 F.3d at 544; *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). Further, the ALJ's decision must build a "logical bridge" that allows the court to assess the validity of the findings and afford the claimant a meaningful judicial review. *Moore*, 743 F.3d at 1121; *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir.2009). In sum, we will affirm the ALJ's decision only if the decision to deny benefits rested on adequate evidence contained in the record and explained why contrary evidence does not persuade. *Berger,* 516 F.3d at 544.

## B.

### THE FIVE-STEP SEQUENTIAL ANALYSIS

Section 423(d)(1) defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n. 1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security

Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.

## ANALYSIS

Ms. Zolno takes a scattershot approach to attacking the ALJ's opinion, peppering it with a hail of arguments she contends require remand. Some of these arguments are perfunctory, undeveloped, and unsupported by caselaw and are thus waived. *See United States v. Hassebrock,* 663 F.3d 906, 914 (7th Cir. 2011) (explaining that "perfunctory and

undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"); *Hess v. Kanoski & Associates*, 668 F.3d 446, 455 (7th Cir. 2012)("This court has repeatedly explained that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

Some amount to nothing more than nitpicking, despite the Seventh Circuit's repeated warnings that a reviewing court will not engage in nitpicking. *See Burnam v. Colvin*, 525 Fed.Appx. 461, 464 (7th Cir. 2013); *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir.2010)(same). Including such arguments serve no purpose and in fact are counterproductive. *See Walker v. Abbott Laboratories,* 416 F.3d 641, 643 (7th Cir. 2005)(decrying the tendency of some lawyers to pile on arguments); *Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir. 2006)(noting the tendency of flabby arguments to displace more focused ones); *Rice v. Nova Biomedical Corp.,* 38 F.3d 908, 918 (7th Cir. 1994); *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir. 1993)("A client is disserved when the most meritorious arguments are drowned in a sea of words."). *See also*, *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001);Matthew Kennelly, *Over-Arguing Your Case*, 40 LITIGATION 41 (Winter 2014).

But others have some traction, not the least of which is the argument regarding the ALJ's step three determination. Ms. Zolno takes issue with the ALJ's rather cursory analysis of whether her condition meets the listing for multiple sclerosis. Given the record and the manner in which the ALJ set forth his determination, a remand is required.

The ALJ concluded at step three that Ms. Zolno's condition did not meet listing 11.09 covering multiple sclerosis. In order to meet the rather convoluted listing, a claimant must demonstrate:

A. Disorganization of motor function as described in 11.04B (Significant and persistent disorganization of motor function in two extremities; resulting in sustained disturbance of gross and dexterous movements or gait or station.)

B. Visual or mental impairment, . . . , or

C. Significant, reproducible fatigue of motor functioning with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved in the multiple sclerosis process.

20 CFR Pt. 404, Subpt. P, App. 1, §11.09. Ms. Zolno bears the burden of showing that her impairments meet a listing, and she must show that her impairments satisfy all of the various criteria specified in the listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). But, an ALJ must provide more than a "perfunctory analysis" in considering whether an impairment meets a specific listing. *Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012). Moreover, as always, he must provide a logical bridge between the evidence and his conclusion. In other words, he must explain his analysis of the evidence with enough detail and clarity to permit meaningful review. *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012).

Here, at step three, the ALJ merely stated that Ms. Zolno did not have significant and persistent disorganization of motor function in two extremities and did not have significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity. (R. 16). The ALJ did not point to any evidence to support his thinking at this point, preferring merely to summarize the medical evidence later in his decision. This certainly makes it difficult to follow the line of the ALJ's reasoning.

There is no analytical link – or "logical bridge" – between the record and the ALJ's determination. *See Kastner*, 697 F.3d at 648.

The ALJ's failure to indicate the evidence he felt supported his finding is significant in this case because the medical evidence contains repeated and regular references to Ms. Zolno's problems with her gait. (R. 326, 330, 393, 394, 416, 417, 425, 431-32). These regularly recurring problems would seem to have the earmarks of "[d]isorganization of motor function . . . in two extremities . . . resulting in sustained disturbance of . . . gait or station." The same goes for fatigue with muscle weakness. The record contains a number of reports referencing both. (R. 326, 377-87, 388, 416, 417, 418, 420, 425, 432, 437). But, the ALJ offers no explanation as to why these pieces of evidence are insufficient to meet the listing. Indeed, the ALJ glossed over these repeated references in his opinion, paying more attention to instances where Ms. Zolno's gait was stable or she had no weakness. (R. 18-20). "An ALJ cannot rely only on the evidence that supports her opinion.... And while an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability." *Bates v. Colvin,* 736 F.3d 1093, 1099 (7th Cir. 2013); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).

The Commissioner submits that the key here is that listing 11.09A, through its reference to section 11.00C requires that disturbance of gait be significant and persistent. The ALJ does not supply this rationale in his opinion, so it cannot be a part of this court's review. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). If the ALJ thought that the various references to gait problems did not amount to significant

problems or that they did not qualify as persistent, he ought to have explained why. In the face of all the reports that mention these issues, the ALJ could not simply say, "there's no evidence to satisfy the listing", especially when there appears to be evidence that arguably does. Moreover, the Commissioner's argument doesn't address the requirements of listing 11.09C, which does not require that muscle weakness be *persistent.*

There is another reason why the ALJ could not so perfunctorily dismiss the repeated mentions of gait disturbance and muscle weakness in the record. Section 11.00D explains that MS is an episodic disease. Thus, consideration must be given to the frequency and duration of exacerbations, length of remissions, and permanent residuals. 20 CFR Pt. 404, Subpt. P, App. 1, §11.00D; *see also Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990)(ALJ failed to consider the episodic nature of MS); *Clark v. Barnhart*, 64 F. App'x 688, 691-92 (10th Cir. 2003); *cf. Kangail v. Barnhart,* 454 F.3d 627, 629 (7th Cir. 2006)(discussing the episodic nature of bipolar disease). As such, "persistent" does not mean "constant", which is apparently what the ALJ was looking for, at least according to the Commissioner – again, there is no way to tell from the ALJ's opinion. It's much more likely that in the instance of an episodic disease like MS it means recurrent. But the ALJ does not appear to have assessed the duration or frequency of the episodes during which Ms. Zolno's disease was exacerbated.

As a remand is required, there is no need to address the balance of Ms. Zolno's arguments, but at least one point is worth making. Ms. Zolno attacks the ALJ's credibility finding, characterizing it as based solely on a comparison of her complaints to the objective medical evidence. That would be a problem if that were the case, *see, e.g.,*

*Moore v. Colvin,* 743 F.3d 1118, 1125 (7th Cir. 2014); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014), but it is not. The ALJ not only looked to the medical evidence, but to the fact that, but for going to prison, Ms. Zolno would have continued working. She worked right up until her incarceration.[3] Notably, Ms. Zolno lied about this to the ALJ at the hearing. She said she stopped working due to her MS – "coincidentally," at the same time she was taken into custody.

The ALJ was not bound to accept that unlikely explanation and could find it too coincidental to be accepted. Cf., *Avery v. Georgia*, 345 U.S. 559, 564 (1953)("The mind of justice, not merely its eyes, would have to be blind to attribute such an occurrence to mere fortuity."). And if it was deemed knowingly false it certainly undermines a claimant's credibility. In addition to that, the ALJ noted that she performed a work detail in prison and noted that her daily activities were not those of one who was completely disabled by MS. (R. 20). Ms. Zolno's studied avoidance of these facets of the ALJ's opinion does not change the reality of what occurred. It simply exhibits a technique of brief writing that is as "unprofessional as it is pointless." *Hill v. Norfolk & Western Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987). In sum, the credibility determination cannot be said to be " patently wrong." *Jones v. Astrue,* 623 F.3d 1155,1162 (7th Cir.2010).

---

[3] While the Seventh Circuit has ruled time and again that a claimant's credibility may be undermined by the objective medical evidence, *see, e.g., Pepper,* 712 F.3d at 386; *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005), the court has also ruled that an ALJ may not disregard a claimant's complaints of pain simply because they are belied by the objective medical evidence, in cases like *Moore* and *Pierce*. These rulings can be harmonized by taking the court to mean that the ALJ can point to the medical record as undermining a claimant's testimony only when the ALJ provides additional reason for doubting it. Still, the court has seemingly upheld credibility determinations based solely on the objective medical evidence on a number of occasions. *See, e.g., Outlaw v. Astrue*, 412 Fed.Appx. 894, 896 (7th Cir. 2011); *Getch*, 539 F.3d at 483; *Adkins v. Astrue*, 226 Fed.Appx. 600, 606 (7th Cir. 2007); *Sienkiewicz*, 409 F.3d at 804. In this case, the ALJ provided additional reasons for not believing Ms. Zolno beyond the medical evidence.

All this is not to say that Ms. Zolno's MS meets the listing or that she is disabled or not. It is simply to say that the ALJ's listing analysis is not sufficiently developed to allow for a meaningful review. It cannot be determined whether the ALJ gave consideration to *all* of the listing's requirements – as noted, it is somewhat byzantine – including the episodic nature of the disease. It may well be that, upon proper consideration – perhaps with the aid of a medical expert – the result will be the same. But as the decision stands, we cannot affirm it. "[W]e cannot uphold a decision by an administrative agency, . . . [even if] there is enough evidence in the record to support the decision, [if] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet*, 78 F.3d at 307.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [Dkt. # 12] is GRANTED, and this matter is remanded to the Commissioner.


ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/18/14